RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0180p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 15-6130

STEPHEN C. ARNY, M.D.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:12-cr-00011—Amul R. Thapar, District Judge.

Argued: June 15, 2016

Decided and Filed: August 1, 2016

Before: GIBBONS, GRIFFIN, and DONALD, Circuit Judges.

———————————

#### COUNSEL

———————————

**ARGUED:** John Patrick Grant, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellant. Kent Wicker, DRESSMAN BENZINGER LAVELLE PSC, Louisville, Kentucky, for Appellee. **ON BRIEF:** John Patrick Grant, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellant. Kent Wicker, DRESSMAN BENZINGER LAVELLE PSC, Louisville, Kentucky, for Appellee.

———————————

#### OPINION

———————————

JULIA SMITH GIBBONS, Circuit Judge. After a three-day jury trial, Stephen Arny, M.D., was convicted of conspiracy to distribute and unlawfully dispense several prescription pain medications in violation of 21 U.S.C. §§ 841(a)(1) and 846. Approximately three months

after the verdict, but before sentencing, Arny secured new counsel, who later moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on trial counsel's constitutionally ineffective assistance. The district court granted the motion based on its finding that Arny's Sixth Amendment right to counsel had been violated. The government appeals. We affirm.

I.

A federal grand jury indicted Arny for his alleged participation in a conspiracy to distribute and unlawfully dispense Oxycodone, Hydrocodone, and Xanax while employed at Paintsville Auto Accident Healthcare ("PAAH"), which was owned and operated by co-defendants Ray and Tina Stapleton. The Stapletons opened PAAH in early 2009, though neither of them were medical doctors, registered nurses, or had prior medical training. At some point, the clinic accepted only cash for its services; a patient's first visit cost $250 and subsequent visits were $200. The Stapletons used a recruiting agency to hire its first doctor, Doina Saxman, M.D., who started in March 2009. They paid Saxman $120 per hour for a forty-hour workweek and provided her with an all-expenses-paid apartment. Saxman resigned from the clinic in July 2010. Saxman was never indicted and is still practicing medicine.

After Saxman resigned, the Stapletons offered Arny the same $120 per hour salary and all-expenses-paid apartment. Arny graduated from medical school in 1979 and served as a medical doctor in the armed forces, practicing occupational medicine, aerospace medicine, and eventually pathology. By 2010, he had retired but wanted to return to work. Because he could not find work in pathology, he accepted the Stapletons' offer to serve as their interim pain medicine doctor until they could hire a Board-certified pain management doctor. Arny started at the clinic in August 2010. He inherited most of Saxman's patients, and Arny typically continued Saxman's treatment plans for returning patients, although he would sometimes decrease the dosages that she had prescribed. After only a month, Arny gave the contractually-required 90-day notice, leaving in December 2010, based on his realization that he was not a "good fit" for the job and because he felt that he could not spend enough time with his patients to adequately treat them. DE 308, Trial Tr., Page ID 2313. Arny soon returned, however, when the Stapletons offered to double his pay to $240 per hour and agreed to make changes so he could better serve his patients. He stayed until September 2011.

In August 2012, a grand jury indicted Arny, the Stapletons, and Arny's successor, Emmanuel Acosta, M.D. The Stapletons pled guilty.[1] Arny hired attorneys Stephen Owens and Wesley Varney ("trial counsel"). More than two years later, in September 2014, Arny went to trial. The government had the burden of proving that Arny conspired with others to distribute controlled substances "outside the course of ordinary medical practice." DE 279, Jury Instructions, Page ID 1436. "To show that drugs were distributed outside the ordinary course of medical practice," the government was required to "prove beyond a reasonable doubt that when the drugs were distributed they were not distributed (1) for a legitimate medical purpose, and (2) in the usual course of medical practice." *Id.* at 1439.

To prove these elements, the government presented the videotaped deposition of expert witness David Paul Harries, M.D., who is a physician licensed to practice medicine in Kentucky and who works at a pain management facility. Dr. Harries reviewed Arny's records and testified that Arny did not examine his patients, did not have valid doctor-patient relationships, did not have a "legitimate medical practice," and prescribed "near toxic" doses and potentially deadly combinations of medications. DE 284-1, Harries Dep., Page ID 1579, 1630. The government also called four of Arny's patients, who testified that they were drug addicts or dealers and did not have a legitimate need for pain medication. The government provided at least one patient witness, Kimberly Preston, with immunity. "In total, the government called 15 witnesses, including the Stapletons, two detectives, and an official from the Kentucky Board of Medical Licensure ("KBML")." *United States v. Arny*, 137 F. Supp. 3d 981, 985 (E.D. Ky. 2015).

Arny's trial counsel called only three witnesses in his defense, including Arny, who testified that he usually continued Saxman's treatment plans for returning patients. Although he repeatedly asked trial counsel to call Saxman as a witness to explain her treatment plans, trial counsel failed to do so. In fact, Varney misrepresented to Arny that "Saxman has either a deal in place or soon will be indicted" and that "her Lexington clinic was searched." DE 405-1, Emails, Page ID 2818–19. Although Owens was copied to this email, he never replied to it or clarified that, as he later testified, this information was false. Trial counsel eventually agreed to serve Saxman with a subpoena, but the process server reported that she was out of the country.

---

[1]After Arny's trial, Acosta pled guilty.

According to Arny, trial counsel misrepresented to him that Saxman would not return to the country or be available for trial, although Saxman actually returned to the United States weeks before Arny's trial started. At an evidentiary hearing following trial, Owens explained that they failed to call Saxman to testify because, unlike Arny, she personally examined all of her patients and because her testimony could have harmed Arny's case.

Trial counsel also called William Ackerman, M.D., a specialist in pain medicine, as an expert witness for Arny. Ackerman testified that KBML rules did not require Arny to see every patient during every visit and opined that Arny was not involved in the criminal conspiracy. However, Ackerman also provided damaging testimony to Arny, such as his statement that Arny "had no standard of care" and that a doctor engaged in pain treatment should "definitely" be trained in pain management. DE 281, Ackerman Dep., Page ID 1499–1500, 1512–13.[2]

The other witness called by trial counsel was Tina Stapleton's mother, Ivory Castle, who had worked at the clinic with Arny. Trial counsel had not met with Castle prior to calling her to the stand. Additionally, trial counsel failed to interview or call to the stand any of Arny's former patients. After the trial, however, Arny was able to produce six affidavits from former patients whose testimony would have helped his defense.

After the three-day trial, the jury convicted Arny, and the district court denied Arny's motion for a judgment of acquittal under Rule 29. After conviction, but prior to sentencing, Arny hired new attorneys, who filed a Rule 33 motion for a new trial based on trial counsel's ineffective assistance. After ordering supplemental briefing and conducting an evidentiary hearing, the district court issued a thorough and well-written opinion, granting Arny's motion for a new trial.

---

[2]During closing argument, the government turned Ackerman's testimony against Arny: "I listened to the testimony of Dr. Ackerman. In some ways—and I say this as a joke—I feel like he should have been a prosecution witness. Felt like maybe we should send him a check because he certainly wasn't on the side of Dr. Arny. Not in the slightest." DE 307, Trial Tr., Page ID 2275.

II.

A.

We review a district court's decision to grant or deny a motion for a new trial for abuse of discretion. *United States v. Soto*, 794 F.3d 635, 645 (6th Cir. 2015). A district court abuses its discretion "when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014) (quoting *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007)).

However, we review ineffective assistance of counsel claims *de novo*, as they present mixed questions of law and fact. *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010) (quoting *Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008)). As this court has explained:

> It is of no consequence that the ineffective-assistance claim in this case is presented in the atypical context of an overarching new-trial-motion determination, which . . . is reviewed for abuse of discretion. This is because mixed questions of law and fact involve the *application of law* to fact, and an improper application of the law constitutes an abuse of discretion.

*Id.* (quotation marks and internal citations omitted). Although the district court was in a unique position to assess the errors of counsel and the effect of those errors on the outcome of the case, we review the district court's Sixth Amendment determination *de novo*.

B.

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).[3] Although the Rule does not define "interest of justice," a violation of a defendant's Sixth Amendment right to the effective assistance of trial counsel constitutes a "substantial legal error" such that a new trial is warranted. *Munoz*, 605 F.3d at 373–74 (gathering cases).

---

[3]Rule 33 requires a defendant seeking a new trial based on any ground other than newly discovered evidence to do so within 14 days after the guilty verdict. Fed. R. Crim. P. 33(b)(2). Arny's motion was filed more than five months after the jury returned its verdict. Nevertheless, the district court, relying on *Munoz*, 605 F.3d at 371, granted Arny leave to file the late motion pursuant to Rule 45(b), finding excusable neglect for the delay in that Arny was still represented by his trial counsel during the 14-day period. The government does not appeal the excusable neglect finding.

This court has previously questioned whether a district court may grant a new trial based on "lackluster representation that does not fall below the constitutionally required standard," *i.e.*, "ineffective assistance light." *Id.* at 362, 374–76. This theory is based on the "broad standard" embodied in Rule 33's "interest of justice" language, which arguably gives the district court the discretion to grant a new trial even if no "specific legal error occurred at trial." *Id.* at 374 (quoting *United States v. Scroggins*, 379 F.3d 233, 256–57 (5th Cir. 2004), *vacated on other grounds*, 543 U.S. 1112 (2005)). However, *Strickland v. Washington* advises that "[t]he principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or *in motions for a new trial*," which has led the Court of Appeals for the Fifth Circuit to hold that "in order to properly grant a new trial on such a ground, the district court must be able to determine that the *Strickland* prejudice test is met." *United States v. Logan*, 861 F.2d 859, 864 (5th Cir. 1988) (quoting *Strickland v. Washington*, 466 U.S. 668, 697 (1984)). It does not appear that a single court of appeals has adopted the "ineffective assistance light" standard,[4] and we find it unnecessary to answer the question here, as Arny's trial counsel failed to adhere to the constitutional standard set forth in *Strickland*.

## C.

To prevail on his ineffective assistance of counsel claim, Arny must first "show that counsel's performance was deficient" by "an objective standard of reasonableness," meaning that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. At all times, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* "Second, [Arny] must show that the deficient performance prejudiced the defense," meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

---

[4]As recognized by this court in *Munoz*, the Court of Appeals for the District of Columbia stated that "a more powerful showing of inadequacy [of counsel] is necessary to sustain a collateral attack than to warrant an order for new trial." *Munoz*, 605 F.3d at 375 (quoting *Bruce v. United States*, 379 F.2d 113, 117 (D.C. Cir. 1967)). However, the D.C. Circuit has never squarely adopted the "ineffective assistance light" theory, and cases such as *Bruce* predate *Strickland*, which further calls into question the import of such language.

The district court based its finding on three deficiencies: (1) trial counsel's misrepresentation that the government had told them that Saxman either had a plea deal or would be indicted soon and that her Lexington clinic was searched; (2) trial counsel's failure to interview Saxman or call her to testify in order to explain the legitimacy of her treatment plans that Arny continued; and (3) trial counsel's failure to investigate or interview any of Arny's patients.

1.

i.

The district court concluded that trial counsel's performance was deficient based on the lie that Saxman would be indicted or offered a plea deal, which both deprived Arny of making an informed decision and constituted "conduct involving dishonesty, fraud, deceit, or misrepresentation." *Arny*, 137 F. Supp. 3d at 987 (quoting Model Rules of Prof'l Responsibility 1.4(b)). On appeal, the government argues that because Varney, the author of the email in question, was not called to testify at the evidentiary hearing, the district court "went too far" in classifying the email as a "lie." Appellant Br. at 28–29. Rather, the government suggests, the email may have been "the product of a misunderstanding or confusion." *Id.* at 29.

Although Varney did not testify during the evidentiary hearing, Owens did. Owens testified that the prosecutor never told him that Saxman had a deal in place or would soon be indicted. Further, Owens was copied on the email in question. Even if Varney himself was confused, as the government suggests, Owens knew the email contained a falsehood. Regardless of whether Varney intentionally lied to Arny or merely misrepresented that Saxman had a deal or would be indicted, the falsehood combined with Owens' knowledge thereof and failure to correct his co-counsel's mistake constitutes deficient performance.

ii.

Although trial counsel had received discovery from the government regarding Saxman, they failed to even interview her, despite Arny's repeated requests that she testify at his trial in order to prove that he had prescribed the drugs for a legitimate medical purpose. The district

court found that trial counsel's failure to interview Saxman was unreasonable. As it did before the district court, the government, on appeal, asserts that because Saxman's testimony would not support Arny's defense that the Stapletons took advantage of him, trial counsel's decision not to interview her was strategic.

However, the proper inquiry asks "not whether counsel's choices were strategic, but whether they were *reasonable*." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (emphasis added). "Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). In *Towns*, this court found that trial counsel's failure to conduct a reasonable investigation into a "known and potentially important witness" violated the petitioner's Sixth Amendment right to the effective assistance of counsel. *Id.* at 259 (quoting *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987)). Although counsel acknowledged the need to contact the potentially important witness, counsel failed to do so, which constituted an abandonment of the "investigation at an unreasonable juncture," thereby "making a fully informed decision . . . impossible." *Id.* at 258–59 (quoting *Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003)). Therefore, this court held that it was objectively unreasonable to pursue a trial "strategy" that does not require interviewing a witness, despite the fact that the witness is "known and potentially important." *Id.* at 259.

Likewise, in this case, it was objectively unreasonable for Arny's trial counsel to fail to interview Saxman. Trial counsel knew that for many patients Arny simply continued Saxman's treatment plan. However, Saxman was not indicted and was, in fact, still practicing medicine. Therefore, her testimony might have persuaded the jury to find that Arny's prescriptions were "for a legitimate medical purpose" and "in the usual course of medical practice." Thus, as in *Towns*, trial counsel acknowledged the need to interview a potentially important witness, but failed to do so. Although Saxman was out of the country on June 30, 2014, when the process server attempted to contact her, she returned on July 15, 2014, approximately two months before the start of trial. Those two months provided trial counsel ample time to attempt to serve a second subpoena on Saxman. Because of trial counsel's failure to interview Saxman, Arny was

left without her potentially powerful testimony. Though the government argues that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Appellant Br. at 32 (quoting *Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir. 2011)), Arny's trial counsel failed to make a reasonable, "thorough investigation" of Saxman's potential testimony. Therefore, trial counsel's decision could not constitute a reasonable "strategic choice." In conclusion, trial counsel's failure to conduct a "thorough investigation" of Saxman before declining to call her to testify at trial constitutes deficient performance.

iii.

The government called four of Arny's former patients as witnesses against him, who all testified that they were drug addicts or dealers who did not have a legitimate need for pain medication. In contrast, Arny's trial counsel not only failed to call any of his other former patients as witnesses, but they also failed to interview any of them. In making that decision, Arny's trial counsel relied solely on the information contained in patient files. The district court concluded that "[t]he record contains no evidence that the decision not to investigate or interview these patients was strategic; rather, it stems from neglect." *Arny*, 137 F. Supp. 3d at 990 (citing *United States v. Six*, 600 F. App'x 346, 351 (6th Cir. 2015)). The government takes issue with the district court's conclusion, asserting that because Arny "prescribed large amounts of near-toxic dosages of controlled substances without legitimate medical purposes," and because "[s]ome of these patients testified that they were addicts who took some pills and sold others," calling "other former patients would have done more harm than good." Appellant Br. at 30–31.

In *Strickland*, the Supreme Court held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. Although counsel need not investigate all potential witnesses, *see Jackson v. Warden*, 622 F. App'x 457, 463 (6th Cir. 2015) (citing *Bigelow v. Williams*, 367 F.3d 562 (6th Cir. 2004)), counsel is required to investigate fruitful leads that a reasonable attorney would pursue, *see id.* at 462–63 (gathering cases). "[S]trategic choices made *after thorough*

*investigation of law and facts* relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Davis*, 658 F.3d at 537 (alteration in original) (emphasis added) (quoting *Strickland*, 466 U.S. at 690–91).

Because they were not aware of the helpful testimony that some of his former patients could have provided, Arny's trial counsel were not in a position to make an informed, strategic decision about the best defense strategy to present. The jury heard testimony only from the patient witnesses presented by the government, who were drug abusers or dealers, leading them to infer that all of Arny's other patients were in a similar situation. However, Arny had former patients who could have testified to the contrary. Specifically, James Bevins could have testified that he suffered from legitimate chronic pain from a motorcycle accident that caused two cracked vertebrae. Also, some of the government's patient-witnesses testified that Arny did not change their prescriptions, which could have led the jury to the conclusion that it was Arny's practice to blindly continue the same treatment plans for all of his patients. However, other former patients could have testified to the contrary on this point. For example, Jamie Adkins could have testified that Arny reduced his doses of muscle relaxer and Xanax. Generally, had trial counsel sought other patient-witnesses, Arny could have benefited from their testimony that he was a good doctor who provided them "quality health care services." DE 434-3, Blair Decl., Page ID 3127.

Trial counsel made an unreasonable decision when they neither investigated nor interviewed Arny's previous patients, as this decision shirked their duty to "investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns*, 395 F.3d at 258. As with Saxman, Arny also asked trial counsel to call former patients as witnesses in his defense. Trial counsel's decision to selectively review patient files "may explain why counsel chose not to investigate other patient *files*, but it does not explain why counsel failed to interview some of Dr. Arny's previous patients to determine if any of them could offer testimony helpful to Dr. Arny." *Arny*, 137 F. Supp. 3d at 990. Moreover, trial counsel knew from discovery that the government intended to call some former patients as witnesses; this, together with Arny's request that the jury hear from patients he had legitimately helped, should

have spurred trial counsel to at least contact some former patients.  Trial counsel's failure to investigate and interview some of Arny's former patients was an unreasonable decision, which led to the uninformed decision not to call any of Arny's other patients to testify.  *See Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).

2.

Turning to step two of the *Strickland* inquiry, we must ask whether trial counsel's deficient performance prejudiced his defense.  *See* 466 U.S. at 694–96.  Arny must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  When counsel's representation is deficient in several respects, as in this case, this court does not measure the result of each individual error, but "consider[s] the errors of counsel in total, against the totality of the evidence in the case." *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 695–96); *see also Dado*, 759 F.3d at 563 ("[E]xamining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006))).

The government argues that because its case against Arny was strong and the jury deliberated for less than three hours, the testimony of Saxman and Arny's patients would not have changed the outcome of the trial.  Further, the government claims that Saxman's testimony would have been more harmful than helpful, because although she may have testified that she prescribed medically appropriate drugs and dosages that Arny often continued, she "did not prescribe drugs to returning patients without examining them and determining the effectiveness of treatment," which was in contrast to Arny's practices.  Appellant Br. at 32–33.

To find Arny guilty of conspiracy to distribute and unlawfully dispense prescription pain medications, the government was required to prove beyond a reasonable doubt that Arny had conspired to distribute controlled substances "outside the course of ordinary medical practice." DE 279, Jury Instructions, Page ID 1436–37.  We are tasked with determining whether there is a reasonable probability that Saxman's and Arny's former patients' testimony would have led the

jury to have reasonable doubt that Arny acted without a "legitimate medical purpose" or outside the "usual course of medical practice." *See id.* at 1439.

The government asserts that because Arny testified but was found guilty, "[t]he jury obviously did not think that his account established legitimate medical purposes for prescribing pain medications in the ordinary course of professional practice." Appellant Br. at 38–39. However, there is a reasonable probability that Saxman's testimony that she, as a practicing pain management specialist, had prescribed the same "near toxic" combination that Harries described, would have demonstrated that there was a legitimate medical purpose for prescribing that combination of medication. As stated by the district court:

> She could have testified that, although she created the treatment plans on which Dr. Arny relied, she continues to practice medicine, and the government has not investigated, arrested, or charged her. Any lay person hearing this would surely have serious questions about whether these combinations of medication were truly toxic. Moreover, Dr. Saxman could have explained why she prescribed those combinations of pills to specific patients. Her testimony, therefore, would have allowed defense counsel to argue that a reasonable doctor would have—and in fact, did—prescribe the combination of medications that Dr. Arny was prescribing. So her testimony could have shown that there was a legitimate medical purpose for these prescriptions.

*Arny*, 137 F. Supp. 3d at 991.

Admittedly, Saxman's testimony that she always saw every patient on their return visits, whereas Arny would sometimes refill prescriptions for his patients without seeing them in person, may not have helped Arny's defense. However, the expert witnesses for both the defense and the government stated that the applicable regulations did not require Arny to see every patient on every visit. Moreover, Saxman's testimony on that point would have been cumulative and not necessarily harmful to Arny. The jury instructions do not make it a crime to not personally see each patient at each visit; in fact, the district court instructed the jury that "[y]ou may not convict the defendant merely because he acted negligently or failed to follow a rule or proper medical standards." DE 279, Jury Instructions, Page ID 1439. When viewed against the totality of the evidence, Saxman's testimony would have helped refute the government's argument that Arny distributed controlled substances outside the ordinary course of medical

practice and helped to establish that he prescribed the medication for a legitimate medical purpose.

Likewise, testimony from patients whom Arny helped would have rebutted the government's evidence that his prescriptions lacked a legitimate medical purpose. Trial counsel could have called former patients to testify that they were not drug abusers but rather had a legitimate medical need for pain medication. For example, James Bevins could have testified that Arny prescribed him pain medications for chronic pain he suffered as a result of a motorcycle accident. Bevins also could have testified that he was examined monthly from September 2010 through September 2011 and that Arny adjusted his medications as necessary, which would have countered the government's theory that Arny did not establish legitimate doctor-patient relationships. From this one witness, the jury would have been left with the impression that not all of Arny's patients were similar to the drug abusers and dealers called by the government.

The affidavits of five other patients whom Arny treated would have further weakened the government's argument that Arny distributed drugs outside the usual medical course and without a legitimate purpose. For example, Annette Blair would have testified that "Dr. Arny was a good doctor and provided me with quality health care services." DE 434-3, Blair Decl., Page ID 3127. Similarly, each of the six patients that Arny's new counsel located, with advance notice of only four business days,[5] would generally have countered the government's story about Arny's *modus operandi*. The government argues that "even if Dr. Arny's former patients could have shown that Dr. Arny have [sic] a valid doctor-patient relationship with them, such testimony would not contradict the testimony that Dr. Arny illegally prescribed drugs to other patients." Appellant Br. at 36. In fact, Arny's trial counsel presented no evidence to counter the damaging testimony of the government-selected former patients; certainly, the helpful testimony of six of Arny's former patients would have shifted the jury's reasoning on whether Arny acted in the usual course of medical practice.

---

[5]After Arny moved for a new trial, the district court ordered him to provide evidence related to his former patients. Four business days later, he submitted six affidavits from previous patients whom he helped or whose testimony would be helpful to his case.

The testimony of Saxman and the former patients establish a "reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Their testimony would have gone to the key elements of unlawful distribution of controlled substances: whether the substances were distributed for a legitimate medical purpose and whether they were distributed in the usual course of medical practice. Arny met his burden and established that his trial counsel rendered ineffective assistance of counsel, which entitles him to a new trial pursuant to Federal Rule of Criminal Procedure 33.

III.

For the reasons stated herein, we affirm.