NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0244n.06

Case No. 15-4363

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Apr 28, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| CHRISTOPHER STEGAWSKI, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GIBBONS, SUTTON, and COOK, Circuit Judges.

SUTTON, Circuit Judge. A jury convicted Christopher Stegawski of conspiring to distribute controlled substances, *see* 21 U.S.C. §§ 841(a)(1), 846, maintaining a place for distributing controlled substances, *see id.* § 856(a), and conspiring to launder money, *see* 18 U.S.C. § 1956(h)—the conventional charges for what has become the all-too conventional means of running a pill mill. On appeal, Stegawski does not challenge the sufficiency of the evidence for his convictions, any procedural or evidentiary rulings, or his sentence. He instead claims that he never would have been convicted if his attorney had conducted the trial as instructed: by inviting convicted doctors to vouch for Stegawski's issuance of opiate prescriptions and by cross-examining the prosecution's expert doctor. But Stegawski's trial attorney did the best a reasonable lawyer could have done with a difficult case. We affirm the denial of Stegawski's motion for a new trial.

I.

A native of Poland, Stegawski graduated from medical school in his home country, after which he immigrated to the United States. He practiced for a few decades and eventually began working for a temporary physician placement agency. The agency connected Stegawski with John Randy Callihan, a previously convicted felon who had set up a pain clinic in Dayton that conducted "no procedures; [] just straight prescription writing." R. 188 at 61. The first two doctors assigned by the placement agency to work with Callihan didn't approve of what he was doing, and left. Stegawski was a better match. Dayton-area pharmacists, however, soon alerted the Ohio State Pharmacy Board of Stegawski's penchant for readily prescribing oxycodone and Xanax for patients. Callihan closed the Dayton clinic when law enforcement asked him about the pharmacists' concerns.

That did not end matters. Stegawski left the placement agency, and he and Callihan set up shop in Lucasville, Ohio. Stegawski owned the clinic in his own name, allowing him to dispense drugs directly to patients and to sidestep regulations prohibiting felons like Callihan from owning pain clinics. Drug addicts and dealers soon began showing up at the clinic. The patients paid in cash for their appointments, and the clinic did not accept medical insurance. Stegawski and Callihan designed the appointments to "get them in and out" as quickly as possible with the barest semblance of treatment. R. 202 at 132. The doctor spent more time with some patients—women whom he found attractive—both in and out of the office.

Undercover law enforcement agents caught on to what Stegawski was doing and managed to obtain medically unnecessary opiate prescriptions from him. As a result, the Ohio State Pharmacy Board denied Stegawski's application to open up a drug dispensary within the

Lucasville clinic. After Callihan and Stegawski had a falling out, Callihan evicted Stegawski from the clinic building.

Stegawski tried to open a new clinic in Portsmouth. But local police shut that operation down too.

With the help of some opioid-addicted patients, the doctor broke into the Lucasville clinic with bolt cutters. He then resumed his practice there until law enforcement (again) closed the clinic.

Stegawski and one of his female patients opened yet another clinic in nearby South Point, Ohio. Before long, law enforcement closed that clinic also.

A grand jury indicted Callihan and Stegawski. Callihan pleaded guilty to conspiring to distribute narcotics and to launder money and agreed to testify against Stegawski. After firing two appointed attorneys, Stegawski instructed his third attorney, Michael Cheselka, to take his case to trial.

Stegawski had his own ideas about the best way to conduct the trial. He envisioned a three-week trial. For the defense's case, Stegawski imagined that he "should testify at least for a week, and at least another week [should be] spent on examining witnesses and presenting evidence." R. 170 at 31. Stegawski's prescription methodology, in his mind, was beyond reproach, and any expert doctor would testify to that effect. Stegawski wanted Cheselka to call forty patients (including a few whom Stegawski had sexual relations with), six co-workers, eight physicians, and a member or two of the Ohio Medical Board and the State Pharmacy Board to the stand. The prosecution's witnesses would break down during cross-examination, he believed, and admit "the techniques used by the [government] agents to obtain incorrect testimony" and their "agree[ments] to falsely testify against" him. *Id.* at 9. If all else failed,

Stegawski "had prepared several, maybe [a] thousand to 2,000 articles," along with "several movies and TV reports" that would reveal the extent of the devious government conspiracy. *Id.* at 68. Convicted doctors from "federal prisons all over the country" would "come to trial to talk about the fact that the prosecution of doctors is a government conspiracy." *Id.* at 79. After considering the corrupt police in *The French Connection*, or pondering the assassination of President John F. Kennedy, the jury would acquit Stegawski on all counts.

But Stegawski's ideas for the trial were not all that mattered. Fortunately for Stegawski and others, clients control the "objectives of representation" while lawyers generally control "the means by which they are to be pursued." Model Rules of Prof'l Conduct r. 1.2(a). Cheselka presented a more traditional defense and secured an acquittal on one count and a dismissal of another. Even so, the jury convicted Stegawski on four other counts. The court imposed a 160-month sentence.

Stegawski fired Cheselka. Through his fourth counsel, Stegawski moved for a new trial on the basis of Cheselka's purported ineffectiveness. After conducting an evidentiary hearing, the district court denied Stegawski's motion across the board.

## II.

On appeal, Stegawski does not challenge the sufficiency of the evidence to support his convictions or his sentence. He instead claims that the court should have granted his motion for a new trial based on the alleged ineffectiveness of his lawyer.

We normally do not review ineffective-assistance claims on direct appeal because the record is "usually insufficient" to review the claim. *United States v. Gardner*, 417 F.3d 541, 545 (6th Cir. 2005). The better approach is usually to wait for a collateral challenge to the conviction under 28 U.S.C. § 2255. *Id.* But in this instance, new counsel raised the claims in a post-trial

motion, the district court held an evidentiary hearing on the motion, developed the record with respect to the claims, and squarely addressed the claims, making it appropriate for us to review that ruling on appeal. *United States v. Arny*, 831 F.3d 725, 730–31 (6th Cir. 2016); *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). Review of a motion for a new trial, it is true, is an "atypical context" for reviewing ineffective assistance claims, but we see no basis for declining to review it, just as we would any other Rule 33 motion. *Id.*

To succeed, Stegawski must show two things: that his lawyer's representation fell short of "an objective standard of reasonableness" and that the deficiencies were "prejudicial" to his case. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). In trying to meet this test, Stegawski focuses on Cheselka's decisions not to retain a medical expert and not to cross-examine the prosecution's medical expert. Neither challenge succeeds.

*Medical expert.* Cheselka reasonably decided not to retain a medical expert because there was not then, and is not now, an identified medical expert who would have supported Stegawski's prescription habits. From the time Cheselka agreed to represent Stegawski, the attorney knew that his client wanted to hire a medical expert to testify at trial. The problem was that they "couldn't find one" willing to testify in Stegawski's defense. R. 170 at 94. Cheselka scoured books and studies looking for doctors who would support Stegawski's liberal prescription practices. He even asked Stegawski if he knew of any doctors who might testify on his behalf. All Stegawski gave his attorney was "a list of articles about doctors who had been prosecuted" and a list of doctors who had "been convicted and are doing time in federal prisons all over the country." *Id.* at 79, 83. We break no new ground in holding that it is a "sound trial strategy," *Strickland*, 466 U.S. at 689, for a criminal-defense lawyer to resist putting an expert on the stand who was convicted for doing just what the defendant was indicted for doing.

One doctor recommended by Stegawski, it is true, was free from such concerns. But that doctor confirms the point: He refused to testify in Stegawski's defense.

Even had this not been the case, any chance of establishing prejudice from this trial strategy was vanishingly slim. In view of the considerable evidence of Stegawski's lax prescription practices, there is no "reasonable probability that," but for trial counsel's alleged error in failing to retain a medical expert, "the result of the proceeding would have been different." *Id.* at 694. Consider some of that evidence. When an undercover officer requested a painkiller to help her sleep, Stegawski recommended the "more powerful" and "much stronger" OxyContin, telling her: "Try them; they're fun." R. 188 at 21–22. Stegawski prescribed his patients as many opiates as they requested. At one point, he prescribed a patient, who used a drug dealer "sponsor" to receive the prescription faster, 150 30-milligram oxycodone pills, 150 15-milligram oxycodone pills, and 30 Xanax pills (nominally) per month. Stegawski had another patient, whom he once asked out to dinner, on 15 30-milligram oxycodone pills and 20 15-milligram oxycodone pills per day.

Other evidence pointed relentlessly in the same direction. The only medical equipment at the clinics was a blood pressure machine in the nurse's room and an examination bed in the room where Stegawski met his patients. Stegawski ignored health conditions and didn't examine patients at follow-up appointments when he re-prescribed painkillers. And Stegawski met some of his female patients outside the office. On several occasions, he drove an hour and a half to Mt. Sterling, Kentucky, to meet a female patient, who was also an employee, at a Walmart parking lot. Stegawski delivered large prescriptions of methadone, oxycodone, Xanax, and Percocet to her and spent the night at the woman's house. Another female patient allowed Stegawski to sleep, shower, and party with her in exchange for drug money and prescriptions.

As Dr. Gronbach, the prosecution's expert in pain management, testified, Stegawski's treatment methodology displayed "a lack of any kind of individualized or tailored medical care for the patients." R. 201 at 103. Stegawski's prescriptions were "extremely unusual combination[s]" of oxycodone, Xanax, methadone, and similar drugs—in other words, "the highest, most addicting combinations of medications." *Id.* at 45, 103. Dr. Gronbach explained how Stegawski ignored patient urinalyses, which showed that some patients weren't taking the medications that Stegawski had prescribed while others were taking painkillers that Stegawski hadn't prescribed. The tests suggested that the former were selling their prescriptions and the latter were buying drugs on the street. Stegawski ignored these warning signs and continued overprescribing painkillers. This sort of evidence has become all-too familiar, now bordering on the cliché. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) (sufficient evidence to convict conspirators when pain clinic doctors regularly prescribed high doses of painkillers to phantom patients and known drug addicts after cursory examinations and up-front cash payments).

Stegawski never explains how a medical expert could have refuted this overwhelming evidence of guilt. Even if Cheselka had hired a medical expert, no one would have "come in and review[ed] the same files" and supported Stegawski's practices. R. 170 at 84. Stegawski asks us "to take the leap of faith" that an uncalled and unnamed medical expert—yet to be found even now—would somehow have rebutted Dr. Gronbach's testimony. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). How can we say that Cheselka committed unconstitutional malpractice for failing to find a doctor that Stegawski and his new lawyer have yet to find to this day? That is a leap of after-the-fact second guessing that *Strickland* commands us not to take.

In truth, Stegawski's only quibble with Dr. Gronbach's testimony is his "interpretation[] of the urinalysis reports contained in the patient files he analyzed." Reply Br. 5. Through it all, however, Stegawski never identifies any urinalysis that Dr. Gronbach misinterpreted.

The Supreme Court, it is true, has held that it is unreasonable for an attorney not to seek additional funds for an expert witness where that failure is based not on any strategic choice but on a mistaken belief about the availability of funds. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam). But the reason Cheselka didn't hire an expert was not a lack of money; it was that he couldn't find a credible expert willing to testify in Stegawski's defense. It's safe to say that, when Cheselka refused to hire doctors because of their previous convictions for similar offenses, he was doing so on strategic (and eminently reasonable) grounds. Cheselka also knew that no expert witness could absolve Stegawski of responsibility for his lax prescription habits if Stegawski himself wasn't able to justify his prescription methods when Cheselka called him to the stand. Cheselka acted reasonably in choosing not to hire an expert.

*Cross-examination.* Although Cheselka cross-examined several witnesses, he decided not to cross-examine Dr. Gronbach. His reason: cross-examination would "reinforce the testimony," and Cheselka wagered that Stegawski, as a doctor, could "walk through point by point" Dr. Gronbach's testimony. R. 170 at 88. Cheselka discussed this strategic decision with his client during the trial. And Cheselka was convinced that it was the best available option despite Stegawski's inattentiveness during trial preparation. Cheselka made this strategic choice "after considering the relevant law and facts," making it particularly difficult to challenge the decision. *Moss v. Hofbauer*, 286 F.3d 851, 864 (6th Cir. 2002). Dr. Gronbach's testimony on the urinalyses and other evidence was cogent and sound. Lacking any legitimate basis for impeachment, Cheselka was wise to avoid drawing further attention to Dr. Gronbach's

testimony. "[O]ther attorneys might have reached a different conclusion about the value of cross-examining" Dr. Gronbach, but Cheselka's "decision was 'within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689).

For these reasons, we affirm.