NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0257n.06

No. 18-3247

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 17, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY CO., | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| ALLIED ERECTING & DISMANTLING CO., | ) | |
| INC., | ) | OPINION |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: SUHRHEINRICH, BUSH, and READLER, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** This breach-of-contract action arises from a dispute over maintenance and use of a roadway between adjacent business properties. Allied Erecting & Dismantling Company, Inc. ("Allied Erecting") appeals the denial of its alternative motions for a new trial or judgment notwithstanding the verdict after a jury verdict and declaratory judgment in favor of plaintiff Norfolk Southern Railway Company ("Norfolk Southern"). Allied Erecting makes three arguments. First, it argues that the district court made errors in the admission and exclusion of extrinsic evidence that favored Norfolk Southern. Second, Allied Erecting argues that the district court erred in excluding explanatory testimony about a clause of the contract and an exhibit that Allied Erecting believes support its defense theory. Third and finally, Allied Erecting argues that the district court's interpretation of the contract produces a manifestly absurd result. For the reasons set forth below, we **AFFIRM** the district court's denial of the alternative motions.

## I.  BACKGROUND

A.      The Parties and Relevant Properties

Norfolk Southern owns and operates the Haselton Yard, a switching yard northeast of Poland Avenue in Youngstown, Ohio.  Allied Erecting engages in the business of constructing and dismantling industrial buildings; it is headquartered on a parcel of land located south of Poland Avenue.

The Canfield Branch is a strip of land over which run disused railroad tracks and a dirt pathway parallel to those tracks (the "pathway").  The portion of the Canfield Branch relevant to this appeal begins northeast of Poland Avenue and runs roughly eastward until terminating below the Haselton Yard.  Allied Erecting owns various parcels of land located on the southern side of the Canfield Branch but north of Poland Avenue.  A sister company of Allied Erecting, Allied Industrial Development ("AID"), owns a parcel north of the Canfield Branch.

A dirt, gravel, and asphalt roadway (the "Current Roadway") abuts the southern edge of the Canfield Branch.  The Current Roadway begins at Poland Avenue, heads roughly northeast until meeting the Canfield Branch, turns east to run parallel with the Canfield Branch for some distance, then turns northeast again across the Canfield Branch and terminates on the northern side of the Canfield Branch at the Haselton Yard.  Part of the Current Roadway is owned by Allied Erecting, and part is owned by AID.  Although the Current Roadway is privately owned, various local property owners, including Norfolk Southern, possess non-exclusive easements over the Current Roadway.  In the years preceding this litigation, Allied Erecting employees also regularly used the Current Roadway to travel between Allied Erecting property and AID property.

In particular, Allied Erecting employees routinely traversed the Canfield Branch at an old crossing located approximately at the mid-point of the Canfield Branch (the "Powers Crossing").

The genesis of the Powers Crossing was in 1872, when brothers Abraham and William Powers—

Youngstown farmers who owned parcels of property north and south of the Canfield Branch that

now belong to AID and Allied Erecting, respectively—conveyed the Canfield Branch to the

Youngstown and Canfield Railroad Company for the purpose of laying railroad tracks. In the deed

(the "Powers Deed") conveying the Canfield Branch, the brothers Powers retained a right to cross

the Canfield Branch so they could travel between the parcels they still owned on the north and

south. In relevant part, the Powers Deed provided:

> [T]he said Railroad Co. as a further consideration of this grant . . . agrees to put up[,] build and maintain and keep in repair along the north side of the said strip of land a good and sufficient post and board fence except at the crossings of the highway . . . .
>
> And further the said Railroad Company & assigns to build and maintain our waggon road crossing at such place as said Grantors may designate[,] said fences and crossing to be built before said strip of land shall be taken possession of.

R. 69-9, PageID 1970–71.

B.     Conrail Conveys the Canfield Branch to Allied Erecting

At the beginning of 1994, the Canfield Branch belonged to the Consolidated Rail

Corporation ("Conrail"). In October of that year, Conrail sold the Canfield Branch to Allied

Erecting. The sale was negotiated by John Ramun, the president of Allied Erecting, and Sandra

Rhodes Homan, who at the time was Manager of Line Sales at Conrail.

Three documents, executed and signed by the parties on separate days, reflected the

relevant terms of the agreement. The first document was an agreement of sale executed on July

22, 1994. It stated in relevant part:

> 17.     Easements. After Closing:
>
> (a)     Purchaser [i.e., Allied Erecting] shall convey to Conrail a permanent, unconditional, exclusive easement for the purpose of a roadway for vehicular and pedestrian traffic to provide access from Poland Avenue to Conrail's

Haselton Yard ("New Roadway"), and Purchaser shall construct the New Roadway at Purchaser's expense. The conveyance of said easement shall be completed within 10 years of the date of this Agreement. The location and bounds of the said easement and the design of the New Roadway shall be subject to the prior approval of Conrail. The New Roadway shall be sufficient for Conrail's intended use; the sufficiency of the New Roadway, as constructed, for Conrail's intended use shall be subject to the approval of Conrail, and no action will be taken to restrict Conrail's use of the roadway that currently runs from Poland Avenue to Conrail's Haselton Yard ("Current Roadway") until Conrail has approved the New Roadway as constructed. The bounds and location of the easement shall not unreasonably interfere with Purchaser's use of the Premises. The deed shall contain a reservation of an unconditional, exclusive easement for the Current Roadway or an alternative roadway for vehicular and pedestrian traffic, the location of which alternative roadway shall also be subject to Conrail's prior approval; said reservation shall provide that said reserved easement shall terminate upon the approval by Conrail of the New Roadway, as constructed.

R. 125-5, PageID 2903.

The second document (the "agreement") was executed on October 10, 1994 and provided

in relevant part:

GRANTOR [i.e., Allied Erecting] will convey to Grantee [i.e., Conrail] a permanent, unconditional, exclusive easement for the purpose of a roadway for vehicular and pedestrian traffic to provide access from Poland Avenue to Grantee's adjoining and adjacent property ("New Roadway"), and Grantor shall construct the New Roadway at Grantor's sole cost and expense. The conveyance of the said easement shall be completed within ten (10) years of the date of this Agreement, as evidenced by a recordable document, otherwise in the absences [sic] of such recordable document this Agreement shall remain in effect. The location and bounds of the said easement and the design of the New Roadway shall be subject to the prior approval of Grantee. The New Roadway shall be sufficient for Grantee's intended use; the sufficiency of the New Roadway as constructed for Grantee's intended use shall be subject to the approval of Grantee, and no action will be taken to restrict Grantee's use of the roadway that currently runs from Poland Avenue to Grantee's Hazelton [sic] Yard ("Current Roadway") until Grantee has approved the New Roadway as constructed. The bounds and location of the easement shall not unreasonably interfere with Grantor's use of the Premises.

R. 125-4, PageID 2894.

4

The third and final relevant document (the "quitclaim deed") was a quitclaim deed executed on October 12, 1994, conveying the Canfield Branch to Allied Erecting. It provided in relevant part:

> EXCEPTING AND RESERVING thereout and therefrom and unto the said Grantor [i.e., Conrail] a permanent, unconditional and exclusive easement on, over, across and through the Premises [i.e., the Canfield Branch] for vehicular and pedestrian roadway access purposes so that Grantor may have continuous ingress, egress and regress rights from Poland Avenue to Grantor's Haselton Yard property; the rights shall expire upon Grantee [i.e., Allied Erecting] providing Grantor a new constructed roadway across property of the Grantee and when said roadway is constructed Grantor shall release such right.
>
> UNDER and SUBJECT, however, to . . . any easements or agreements of record or otherwise affecting the Premises, and to the state of facts which a personal inspection or accurate survey would disclose . . . .

R. 125-3, PageID 2880. We will refer to the easement mentioned in the "excepting and reserving" clause as Norfolk Southern's "reserved easement." We will refer to the second clause quoted above as the "under and subject to" clause.

C.     Norfolk Southern Succeeds Conrail

Prior to 1999, Conrail owned the Haselton Yard. In 1997, CSX Transportation, Inc. and Norfolk Southern's parent company Norfolk Southern Corporation ("NSC") filed a joint application with the United States Surface Transportation Board (the "Board") to operate Conrail's routes and assets. In 1999, Conrail conveyed the Haselton Yard, and all other Conrail property interests assigned by the Board to Norfolk Southern, to Pennsylvania Lines, LLC, which NSC had created for the purpose. In 2007, Norfolk Southern merged with Pennsylvania Lines and became the owner of all property interests previously held by Pennsylvania Lines, including the Haselton Yard. Norfolk Southern also took the place of Conrail with respect to the 1994 Canfield Branch conveyance.

D.    The Dispute

Because Allied Erecting employees were engaged in a project on AID property north of the Canfield Branch, they often drove across the Current Roadway in heavy vehicles such as bulldozers and large dump trucks called Euclids.  For a period of over two years between approximately May 2011 and July 2013, these large machines crossed the Current Roadway practically every day.  Over time, large and multitudinous potholes developed on the Current Roadway, and Norfolk Southern employees complained about the difficulty of driving to the Haselton Yard from Poland Avenue.  Because neither Allied Erecting nor AID maintained the Current Roadway, Norfolk Southern began maintaining it.

Norfolk Southern soon tired of maintaining the Current Roadway.  In 2012, Norfolk Southern employee and property agent Virginia Caso King researched the ownership of the Current Roadway and learned about the 1994 Canfield Branch conveyance from Conrail to Allied Erecting.  Upon finding the agreement and the quitclaim deed, King contacted Allied Erecting's president, Ramun, and asked him about those documents.  When Ramun stated that he did not remember the agreement and the quitclaim deed, King sent him those documents as well as a letter in which she paraphrased some of the documents' terms.  Upon receipt of the letter, Ramun was not inclined to admit that Allied Erecting had any obligations under the agreement or the quitclaim deed.

Shortly after communicating with Ramun, King was transferred to a different Norfolk Southern territory.  King's successor in Youngstown, Eric Sylvester, reinitiated contact with Ramun, but Ramun maintained his previous position with regard to the agreement and the quitclaim deed.

E.      Procedural History

Norfolk Southern sued Allied Erecting in the Northern District of Ohio in February 2013. The complaint alleged a breach of contract and sought damages (Count 1), specific performance (Count 2), and a declaratory judgment that Norfolk Southern was entitled to a permanent, exclusive, and unconditional reserved easement over the Canfield Branch as well as a permanent, exclusive, and unconditional easement for a new roadway connecting Poland Avenue to the Haselton Yard, to be constructed at Allied Erecting's expense and subject to Norfolk Southern's approval (Count 3).  Norfolk Southern also sought a declaration that Allied Erecting was obligated not to restrict Norfolk Southern's use of the Current Roadway until the new roadway was approved.

1.      The Pre-Trial Motions

After discovery, Norfolk Southern filed a motion for partial summary judgment.  In its opposition to the motion, Allied Erecting argued (among other theories) that the "under and subject to" clause in the quitclaim deed made Norfolk Southern's reserved easement subject to preexisting easements and agreements affecting the Canfield Branch.  Allied Erecting argued that the Powers Deed created such a preexisting easement and gave it a right to cross the Canfield Branch at the Powers Crossing even if that meant crossing Norfolk Southern's reserved easement.

In its order denying Norfolk Southern's motion, the district court mentioned, but did not address on the merits, Allied Erecting's argument based on the Powers Deed.  Instead, the district court denied Norfolk Southern's motion on the ground that the terms "Current Roadway" and "easement" in the agreement and the quitclaim deed, respectively, were ambiguous.  Because those two documents did not make clear where the "Current Roadway" and Norfolk Southern's reserved easement across the Canfield Branch were supposed to be located, and Norfolk Southern and

7

Allied Erecting disagreed on these issues, a genuine dispute of material fact existed about the meaning of the agreement and the quitclaim deed.

The case was set for trial, and both Norfolk Southern and Allied Erecting filed motions in limine relevant to this appeal. Norfolk Southern filed a motion to exclude any evidence Allied Erecting might try to present about its preexisting right to cross the Canfield Branch over Norfolk Southern's reserved easement.[1] Determining that Allied Erecting's claim of a preexisting easement was an affirmative defense, the district court found that Allied Erecting had forfeited the argument by failing to raise it in its answer to the complaint. Therefore, the district court granted Norfolk Southern's motion in limine.

Norfolk Southern also filed a motion in limine to exclude evidence of Allied Erecting's present and future plans for development of the Canfield Branch or surrounding parcels. The district court granted this motion too, reasoning that Allied Erecting had not shown that the asserted plans existed at the time of the Canfield Branch conveyance in 1994, so the plans were not relevant to the intent of the parties.

Finally, Allied Erecting filed a motion in limine seeking to exclude any testimony by Norfolk Southern employees King and Sylvester relevant to the meaning of the agreement and the quitclaim deed. Allied Erecting argued that such testimony should be excluded because Conrail, not Norfolk Southern, had negotiated the terms of the Canfield Branch conveyance. Therefore, Norfolk Southern employees had no personal knowledge of the intent of the parties to the agreement and the quitclaim deed. Allied Erecting also argued that the testimony should be excluded because Norfolk Southern's interpretation of the agreement and the quitclaim deed would

---

[1] At the time, Allied Erecting was claiming not only an express easement based on the Powers Deed but also an easement by necessity and an easement by prior use. On appeal, Allied Erecting argues only that it has an express easement based on the Powers Deed.

produce the "manifestly absurd result" of "provid[ing] only cost and no benefit to Allied Erecting." R. 104, PageID 2229, 2231.

The district court granted Allied Erecting's motion in part, stating that it would allow witnesses "who were not part of the 1994 contract negotiations" to "testify as to their understanding of the agreements to the extent that it is relevant to subsequent actions taken by" those witnesses. R. 159, PageID 3264. However, those witnesses would not be permitted to testify about "the intent of the original parties to the agreements." *Id.* The district court did not address Allied Erecting's "manifest absurdity" argument.

2.      The Trial, Post-Trial Motions, Verdict, and Judgment

Trial was held over five days in June and July 2015. Through witness testimony, the ambiguities as to the location of the "Current Roadway" referenced in the agreement and of the "easement" referenced in the quitclaim deed were resolved as follows: the "Current Roadway" was the dirt, gravel, and asphalt roadway that ran parallel to and then crossed the Canfield Branch and over which Norfolk Southern had a non-exclusive easement; the "easement" that the quitclaim deed reserved exclusively to Norfolk Southern was supposed to be over the pathway located on the Canfield Branch parallel to the disused railroad tracks.

Testimony also established that Norfolk Southern generally did not use the pathway, as it was only ten to fifteen feet wide and was less suitable for traffic than the Current Roadway. Instead, Norfolk Southern employees generally used the Current Roadway to access the Haselton Yard from Poland Avenue, diverting onto the pathway only when necessary to avoid the potholes that developed on some parts of the Current Roadway. Most of the Norfolk Southern traffic on the Current Roadway consisted of passenger vehicles; vehicles used for work, such as a pickup truck; and a dump truck.

Likewise, although Allied Erecting employees generally used the Current Roadway to travel between parcels on the northern and southern sides of the Canfield Branch, they occasionally drove on parts of the pathway when it was convenient. All witnesses agreed that Allied Erecting had not conveyed an easement for a new roadway or built a new roadway for Norfolk Southern by the time of trial.

At the close of the evidence, Norfolk Southern moved for partial summary judgment. Allied Erecting filed a memorandum in opposition to Norfolk Southern's motion and also moved for judgment as a matter of law. The district court denied both motions and submitted the case to the jury.

The jury returned its verdict on Count 1, Norfolk Southern's claim for damages, through answers to interrogatories. It found that Allied Erecting had breached its contract with Norfolk Southern "[b]y failing to provide Norfolk Southern with a permanent, unconditional, and exclusive easement between Poland Avenue and the Haselton Yard;" "[b]y failing to construct a new roadway, providing access between Poland Avenue and the Haselton Yard for Norfolk Southern's exclusive use, within ten years of the date of the agreement that John Ramun signed on October 10, 1994;" and "[b]y failing to convey a permanent, unconditional, and exclusive easement for the new roadway within ten years of the date of the agreement that John Ramun signed on October 10, 1994." R. 173, PageID 3964. The jury awarded Norfolk Southern $223,424.30 in damages: $218,000 to cover the cost of a new roadway and $5,424.30 to compensate Norfolk Southern for its maintenance of the Current Roadway.

Following the jury verdict, the district court entered judgment in favor of Norfolk Southern on Count 1 as well as Count 2 (specific performance) and Count 3 (declaration of rights). The district court found that Allied Erecting had breached the agreement by failing to convey a

permanent, unconditional, and exclusive easement to Norfolk Southern or build a new roadway, and that Allied Erecting's failure to maintain the Current Roadway restricted Norfolk Southern's use of that roadway, as prohibited by the agreement. Likewise, the district court found that Allied Erecting had not treated the reserved easement over the pathway as "exclusive to Norfolk Southern as required by the reservation language in the Second Agreement [i.e., the quitclaim deed]." R. 183, PageID 4043.

Based on these findings, the district court held that "because the jury verdict included an award to Norfolk Southern for the cost of building a Replacement Roadway, Allied Erecting's obligation to build a new roadway is extinguished." *Id.* at PageID 4045. But Allied Erecting was still required to "convey to Norfolk Southern a permanent, unconditional, and exclusive easement for the purpose of a new roadway," and the district court ordered the conveyance to be done within sixty days. *Id.* The district court also ordered Allied Erecting to satisfy the jury's damages award within thirty days, to begin maintaining the Current Roadway, and to "cease using the Reserved Easement" over the pathway. *Id.* at PageID 4046.

3.    Allied Erecting's Motions for a New Trial or for Judgment Notwithstanding the Verdict

After the district court entered its judgment, Allied Erecting filed motions for a new trial or, in the alternative, for judgment notwithstanding the verdict ("JNOV"), also known as a renewed motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). In its order denying the motions, the district court noted that Allied Erecting had commenced bankruptcy proceedings, had "reached an agreement in Bankruptcy Court" with Norfolk Southern about payment of the judgment, and had begun making payments. R. 209, PageID 4412. Therefore, the district court found that Allied Erecting's motions were moot.

Allied Erecting appealed. It asks this court to reverse the district court's denial of its motion for JNOV or, in the alternative, remand for a new trial.

## II. DISCUSSION

Before turning to Allied Erecting's merits arguments for reversal, we will briefly address the district court's determination that Allied Erecting's motions for JNOV or a new trial were moot. The district court did not explain why it believed the motions had become moot as a result of the payment plan, and we do not agree with that ruling.

A week before the district court's order, Norfolk Southern filed a memorandum explaining that it had received only one payment so far under the plan, noting that the remainder of the judgment would "potentially" be paid in installments from a creditor trust, and stating that whether the judgment would "be paid in full remains an open question until all of the completed sales of [Allied Erecting's] assets have occurred." R. 207, PageID 4313, 4314. Neither party has notified the district court or this court that any more payments have been made since the first one. Furthermore, Allied Erecting's plan of reorganization, which Allied Erecting filed with the district court as an exhibit, acknowledges Allied Erecting's motions for JNOV or for a new trial and states that the judgment for Norfolk Southern is disputed. Thus, this is not like cases that become moot as a result of a defendant's voluntarily paying the judgment. *See Matter of Latham*, 823 F.2d 108, 111 (5th Cir. 1987).

In sum, there is still money at stake in this action. As the Supreme Court has made clear, a case is not moot as long as a court may award some relief to a party. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Here, a grant of either of Allied Erecting's motions would have given Allied Erecting an opportunity to get free of the judgment completely and cease making payments. What

is more, neither party argued to the district court or argues now that the case or Allied Erecting's motions are moot.

Thus, we will address the merits of the dispute, which both parties have fully briefed. Although "[i]t is the general rule that a federal appellate court does not consider an issue not passed upon below," *Lindsay v. Yates*, 498 F.3d 434, 441 (6th Cir. 2007) (citation omitted), we may do so if "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of this already protracted litigation," *Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) (citation omitted). Moreover, if "the decision below is correct[,] it must be affirmed by the appellate court though the lower tribunal gave a wrong reason for its action." *J. E. Riley Inv. Co. v. Comm'r*, 311 U.S. 55, 59 (1940) (citation omitted).

Allied Erecting makes three arguments in support of reversal. First, it argues that the district court made erroneous rulings on the admissibility of extrinsic evidence. The alleged errors are (1) permitting King to testify about her understanding of the agreement and the quitclaim deed and (2) excluding evidence of Allied Erecting's present and future plans for developing its parcels of land near the Canfield Branch and the Haselton Yard. Second, Allied Erecting argues that the district court erred in excluding testimony about the "under and subject to" clause in the quitclaim deed and about an exhibit that was relevant to Allied Erecting's argument that it had a preexisting easement over the Canfield Branch. Third and finally, Allied Erecting argues that the district court's interpretation of the agreement and the quitclaim deed is "manifestly absurd." Appellant Br. at 31.

A.      Standard of Review

We review the denial of a new trial motion under Federal Rule of Civil Procedure 59 for an abuse of discretion. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996). "A district court

abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *United States v. Arny*, 831 F.3d 725, 730 (6th Cir. 2016) (citation and internal quotation marks omitted).

In reviewing the denial of a motion for JNOV under Federal Rule of Civil Procedure 50(b), we will reverse only if "reasonable minds could not come to a conclusion other than one favoring the movant." *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013) (citation omitted). In making this determination, we must not weigh the evidence or assess the credibility of witnesses, and we must view the evidence "in the light most favorable to the" nonmoving party, giving that party "the benefit of all reasonable inferences." *Id.* (citation omitted).

If an alleged error in the admission or exclusion of evidence was harmless, we will not reverse for abuse of discretion, *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994), or reverse a denial of JNOV, *see* Federal Rule of Civil Procedure 61. Harmless error is error that does not "affect any party's substantial rights." Fed. R. Civ. P. 61. "An error affects substantial rights if it affect[s] the outcome of the case." *United States v. Walker*, No. 18-1256, 2019 WL 326483, at *3 (6th Cir. Jan. 24, 2019) (internal quotation marks omitted) (quoting *United States v. Teh*, 535 F.3d 511, 516 (6th Cir. 2008)).

B.    Extrinsic Evidence

1.    King's Testimony

Allied Erecting first argues that the district court abused its discretion by permitting King to testify about her understanding of the agreement and the quitclaim deed. As noted above, the district court allowed Norfolk Southern employees King and Sylvester to testify about their understanding of these documents insofar as their understanding was relevant to explain their actions in the history of the dispute. Allied Erecting now argues that because Norfolk Southern

was not involved in negotiating the terms of the Canfield Branch conveyance, even King's testimony about her communications with Ramun should have been excluded. To support its theory, Allied Erecting argues that Ohio contract law permits extrinsic evidence to be admitted only if it is relevant to the intent and understanding of the parties to the contract at the time of formation.[2]

It is true that King's testimony was irrelevant to the jury's task of determining the meaning of the agreement and the quitclaim deed, as she was neither a party to nor a negotiator on behalf of a party to those documents. *See Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (stating that "[e]xtrinsic evidence is admissible" in contract cases "to ascertain the intent of the parties when the contract is unclear or ambiguous"). However, we need not decide whether the district court should have excluded King's testimony, because even if we assume that some of it should have been excluded, any error was harmless.

The testimony that Allied Erecting now claims was erroneously admitted was, in pertinent part, as follows:

> Q. Did you look at [the agreement and the quitclaim deed] to determine any property issues with regard to the Canfield Branch?
>
> A. Yes, I did.
>
> Q. And based on your experience and training, what did you determine following your investigation?
>
> A. I determined that the deed was to convey the Canfield Branch to Allied Erecting.
>
> . . . .

---

[2] At one point, Allied Erecting asserts that King's testimony "violated the parol evidence rule." Appellant Br. at 21. However, the parol evidence rule is a substantive rule of contract law that governs when the contracting parties' oral promises may be considered together with a writing as part of a contract. *See Charles A. Burton, Inc. v. Durkee*, 109 N.E.2d 265, 270–71 (Ohio 1952). Allied Erecting is challenging the admission of what it sees as irrelevant opinions about the contract's meaning rather than arguing that the district court improperly considered evidence of the parties' extratextual commitments. Therefore, we will address the relevancy issue and harmless error rather than the parol evidence rule.

> A.  The agreement was that within a ten-year period, Allied Erecting was to build a roadway for the railroad for its own exclusive use—and—well, basically that's all.
>
> Q.  Was that to connect Poland Avenue with Haselton Yard?
>
> A.  Yes.

R. 167, PageID 3497.  This testimony was little more than a brief recitation of some of the plain language of the quitclaim deed and the agreement.[3]

Later, counsel for Norfolk Southern asked King to read aloud the letter she had written to Ramun in 2012 explaining her understanding of the quitclaim deed's and the agreement's respective terms.  The letter was also published to the jury.  In pertinent part, it said:

> Thank you for returning my calls so promptly this afternoon.  As discussed today, I was asked to review ownership of the driveway utilized by Norfolk Southern railway employees to access our Haselton Yard facility off of Poland Avenue.  The reason for the question was due to the poor condition of the driveway.
>
> Our research uncovered a deed which conveyed a portion of the railroad property known as the Penn Central E&A branch, aka, the Canfield Branch, from Consolidated Rail Corporation to Allied Erecting and Dismantling Company, dated October 12, 1994.  In connection with that deed, there was an instrument dated October 10, 1994, whereby Allied Erecting and Dismantling Company, Inc., grantor, grants to Consolidated Rail Corporation, grantee, a permanent easement for a new roadway which location, bounds and design of the new roadway were to be subject to the prior approval of grantee.  The conveyance of said easement was to be completed within ten years of the date of the agreement which would have been October of 2004.  The grantor was to conduct [sic] the new roadway at grantor's sole cost and expense.

*Id.* at PageID 3501–02.  Although Allied Erecting views this letter as encapsulating improper opinions about the contract's meaning, the letter simply gave a very close paraphrase of some of

---

[3] To the extent that King's statement that Allied Erecting had agreed to build a new roadway within ten years could be seen as more than a mere paraphrase of the agreement, that statement was harmless to Allied Erecting. Although the agreement stated that Allied Erecting would provide an *easement* for a new roadway within ten years, and not necessarily build the new roadway itself within that time, the dispute at trial was over whether Allied Erecting had any obligations at all under the agreement, not over the timing of any roadway construction vis-à-vis the conveyance of an easement for a new roadway.

the terms of the quitclaim deed and the agreement. Allowing King to read her letter to the jury was not prejudicial to Allied Erecting.

### 2. Excluded Allied Erecting Testimony

Allied Erecting next argues that the district court should have allowed it to put on testimony about its present and future plans for the development of parcels around the Canfield Branch and the Haselton Yard. Those plans were relevant to Allied Erecting's intent behind the negotiations with Conrail, Allied Erecting argues, so they "were proper extrinsic evidence" of the meaning of the agreement and the quitclaim deed. Appellant Br. at 23. Norfolk Southern responds—as did the district court, in granting Norfolk Southern's motion in limine—that Allied Erecting has not demonstrated that any of the development plans existed at the time the agreement and the quitclaim deed were negotiated, so the plans are irrelevant to the question of the parties' intent at the time of contracting.

We need not address the relevancy point, however, because Allied Erecting has not identified what evidence it believes was improperly excluded. Despite the district court's ruling on the motion in limine, it allowed counsel for Allied Erecting to elicit over a transcript page's worth of uninterrupted reminiscence from Ramun about Allied Erecting's reasons for wanting the Canfield Branch in 1994. Allied Erecting leaves to our imagination what more evidence of its development plans it would have introduced but was not permitted to: it identifies no witness, document, exhibit, or other evidence with which it would have educated the jury. Not knowing what it is the district court excluded, we cannot say that the alleged exclusion was erroneous.

### C. Exclusion of Testimony Relevant to the Powers Crossing

Next, Allied Erecting contends that the district court erred in excluding evidence relevant to its claim of a preexisting easement, by way of the Powers Crossing, over the Canfield Branch.

First, Allied Erecting challenges the district court's preventing its witnesses from reading aloud and testifying about the "under and subject to" clause in the quitclaim deed. Second, Allied Erecting argues that the district court erred in excluding testimony about an exhibit containing a map that Allied Erecting claims shows the location of the Powers Crossing.[4] We must determine whether the district court's reason for excluding this testimony was correct, and, even if not, whether the evidence was nevertheless properly excluded. The answer to the first question is no, but the answer to the second is yes.

1.      The Powers Deed Argument Was Not an Affirmative Defense

In excluding the testimony, the district court held that Allied Erecting's argument that it had a right to cross the Canfield Branch was an affirmative defense, and Allied Erecting had forfeited the defense by failing to assert it in its answer. As a general rule, "[f]ailure to plead an affirmative defense in the first responsive pleading to a complaint" forfeits the defense. *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) (citation omitted); *see* Fed. R. Civ. P. 8(c)(1). However, for the district court's reasoning to have been correct, the Powers Deed argument must in fact be an affirmative defense to breach of contract. The district court cited no authority in support of its conclusion. After reviewing the pleadings in this case, as well as Ohio law on affirmative defenses and on breach of contract, we conclude that Allied Erecting's argument is not an affirmative defense.

---

[4] Allied Erecting's principal brief indicates that the "under and subject to" clause in the quitclaim deed as well as the exhibit were excluded entirely. That is not true; the entire quitclaim deed as well as the exhibit were admitted into evidence. However, Allied Erecting is clearer in its reply brief: it takes issue with the district court's decision to prevent witnesses "from mentioning, testifying about, and/or drawing the jury's attention to" the "under and subject to" clause and the exhibit. Reply Br. at 4. Allied Erecting argues that the map contained in the exhibit would have been meaningless to the jury without testimony explaining it; having seen the map, we have sympathy for this contention.

As to affirmative defenses, Ohio law provides:

> An affirmative defense is a new matter which, assuming the complaint to be true, constitutes a defense to it. An affirmative defense is any defensive matter in the nature of a confession and avoidance. It admits that the plaintiff has a claim (the "confession") but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the "avoidance").

*State ex rel. The Plain Dealer Publ'g Co. v. City of Cleveland*, 661 N.E.2d 187, 189–90 (Ohio 1996) (citations and some internal quotation marks omitted); *see also R.C. Olmstead, Inc. v. GBS Corp.*, 2009-Ohio-6808, No. 08 MA 83, 2009 WL 4981226, at ¶ 41 (Ohio Ct. App. Dec. 18, 2009) ("An affirmative defense attacks the legal right to bring a claim as opposed to attacking the truth of the claim." (citation omitted)).

As to breach of contract, Ohio law requires four elements. The plaintiff must show (1) that a contract existed, (2) that the plaintiff "performed its contractual obligations," (3) that the defendant "failed to fulfill its contractual obligations without legal excuse," and (4) that the plaintiff "suffered damages as a result of the breach." *Garofalo v. Chi. Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 1995) (citations omitted).

Allied Erecting's filings show that its theory was that Norfolk Southern could not make out a prima facie case of breach. First, Allied Erecting's answer clearly denied all paragraphs of Norfolk Southern's complaint alleging that Allied Erecting had failed to fulfill its contractual obligations. Later, Allied Erecting's opposition to Norfolk Southern's summary judgment motion fleshed out the denial. It explained that on Allied Erecting's reading of the "under and subject to" clause, that clause protected Allied Erecting's right to cross the Canfield Branch at the Powers Crossing. In other words, the "under and subject to" clause was as much a part of the quitclaim deed as the clause reserving an easement to Norfolk Southern, and Allied Erecting argued that it

had not breached the terms of the quitclaim deed by taking advantage of the "under and subject to" clause.

An Ohio case with analogous procedural facts illustrates why Allied Erecting did not forfeit the Powers Crossing argument. In *Red Head Brass, Inc. v. Buckeye Union Insurance Co.*, 735 N.E.2d 48, 51 (Ohio Ct. App. 1999), the plaintiff sued its insurer claiming (among other things) breach of contract based on the insurer's alleged failure to provide for the plaintiff's legal representation in underlying litigation. The insurer moved for, and was granted, summary judgment. *Id.* On appeal, the plaintiff argued that the trial court had improperly considered two defensive arguments by the insurer that should have been disregarded as forfeited, as the insurer had not specified them in its answer. The first defensive argument was that the insurance policy required the insurer only to *defend* the plaintiff against legal claims, not to represent it on claims or counterclaims it chose to assert. *Id.* at 53. The second defensive argument was that the plaintiff had not complied with a provision of the insurance policy requiring the plaintiff to provide the insurer with adequate notice of underlying litigation in which the plaintiff wished to be represented. *Id.*

The Ohio Court of Appeals ruled that these arguments about "the extent of [the insurer's] duty to defend under the insurance policy and to reimburse [the plaintiff's] legal expenditures" were not affirmative defenses because they were not "an admission of [the plaintiff's] claim coupled with a theory of avoidance of recovery." *Id.* Therefore, the insurer's answer—which had (1) denied that the plaintiff had fulfilled its contractual obligations, (2) denied that the insurer had a duty to bring a counterclaim on behalf of the plaintiff, and (3) denied that the plaintiff's claim for reimbursement of litigation expenses was "in accordance with the Policy"—was "sufficient to put [the plaintiff] on notice" of the insurer's defense. *Id.*

Similarly, although Allied Erecting did not cite specific clauses of the quitclaim deed in its answer, it clearly denied having breached its obligations under the quitclaim deed or the agreement. That denial was adequate to preserve Allied Erecting's defense based on the "under and subject to" clause.

2.       The District Court Properly Excluded Testimony About the Powers Deed

Having concluded that Allied Erecting did not forfeit its argument based on the Powers Deed, we must determine whether the district court nevertheless properly excluded testimony about the Powers Deed. Norfolk Southern argues that even assuming Allied Erecting has not forfeited the argument, the district court properly excluded the testimony because Allied Erecting does not have an easement across the Canfield Branch. On Norfolk Southern's reading, the Powers Deed created an easement in gross, which is "personal only to the grantee" and is not descendible or transferable. *Walbridge v. Carroll*, 875 N.E.2d 144, 148 (Ohio Ct. App. 2007). The Powers Deed did not confer a perpetual right, argues Norfolk Southern; it simply granted a wagon crossing to the Powers brothers that would expire when they died or conveyed their land to another.

In response, Allied Erecting argues that the Powers Deed created an easement appurtenant that runs with the land under Ohio law. An easement appurtenant involves two parcels of land: the dominant estate (also sometimes referred to as the "dominant tenement") is benefited by the easement, and the servient estate (or "servient tenement") is subject to the easement. *See Goralske v. Parsell*, 59 N.E.3d 730, 738 (Ohio Ct. App. 2016). On Allied Erecting's theory, the Powers brothers retained a right for themselves and all future owners of their property, the dominant estate, to cross the Canfield Branch, the servient estate. Because an easement appurtenant benefits the dominant estate regardless of changes in ownership, *see id.*, Allied Erecting believes that as the

21

owner of the erstwhile Powers parcel bordering the southern end of the Powers Crossing, it has a right to use that crossing.

However, even assuming that Allied Erecting is correct about the nature of the easement created by the Powers Deed,[5] Allied Erecting has no easement. The doctrine of merger, which Ohio recognizes, dictates that an easement appurtenant is extinguished "when the dominant and servient tenements come into the ownership of the same party." *Shah v. Smith*, 908 N.E.2d 983, 986 (Ohio Ct. App. 2009). As the Ohio Court of Appeals has put it, "there is no reason for an owner to hold an easement against himself." *Id.*; *see also Warren v. Brenner*, 101 N.E.2d 157, 159 (Ohio Ct. App. 1950) (stating that an easement "is an invisible and intangible right and interest . . . conferring upon the grantee some lawful use out of or from the estate *of another*" (emphasis added)). Here, Allied Erecting already owned the dominant estate south of the Powers Crossing when it bought the Canfield Branch from Conrail in 1994.[6] That conveyance made Allied Erecting the owner of both the dominant and the servient estates and extinguished any easement Allied Erecting may have had. Therefore, Allied Erecting cannot assert a right to use the Powers Crossing as an "easement[] . . . affecting the Premises" to which Norfolk Southern's reserved easement is allegedly subject.

Because Allied Erecting has no easement based on the Powers Deed, that deed provides no defense to Norfolk Southern's breach-of-contract allegations. Therefore, the district court did not

---

[5] For reasons relating to the particular wording and vintage of the Powers Deed, the answer to the in-gross versus appurtenant inquiry is not clear. However, an unpublished decision of the Ohio Court of Appeals both explains (with gratifying thoroughness) the unclarity in this area and reaches a result strongly suggesting that Allied Erecting is correct, and the Powers Deed created an easement appurtenant. *See Merrill Lynch Mortg. Lending, Inc. v. Wheeling & Lake Erie Ry. Co.*, 2010-Ohio-1827, No. 24943, 2010 WL 1692011 (Ohio Ct. App. Apr. 28, 2010).

[6] As noted above, AID owns the parcel north of the Canfield Branch that used to belong to the Powers brothers. But AID is not a party to this lawsuit and its right (or lack thereof) to cross the Canfield Branch is not at issue.

err in excluding testimony about Allied Erecting's alleged right to cross the Canfield Branch at the Powers Crossing.

D.      Manifest Absurdity

Finally, Allied Erecting argues that the district court's interpretation of the contract, reflected in its declaratory judgment and order granting specific performance to Norfolk Southern, is manifestly absurd.

As noted above, Allied Erecting made a motion in limine to exclude any testimony by Norfolk Southern employees about Norfolk Southern's interpretation of the agreement and the quitclaim deed. Part of Allied Erecting's argument for excluding the testimony was that Norfolk Southern's proposed interpretation was manifestly absurd. However, Norfolk Southern argues that Allied Erecting's appellate manifest-absurdity argument is a new theory of error that this court should ignore as unpreserved, because Allied Erecting's appellate argument is not couched solely in evidentiary terms. Alternatively, Norfolk Southern contends that if we view Allied Erecting's motion in limine as having raised the manifest-absurdity argument, we should still disregard the argument on the theory that a motion in limine does not preserve an evidentiary objection for appeal.

As to Norfolk Southern's first point, we believe that Allied Erecting adequately raised the manifest-absurdity argument in its motion in limine. Although Allied Erecting no longer styles the argument as an objection to the admission of evidence, the substance of the argument is the same as in the motion in limine. Allied Erecting views the district court as having erroneously adopted Norfolk Southern's interpretation of the agreement and the quitclaim deed—an interpretation which, in Allied Erecting's view, is so absurd that testimony supporting it should have been excluded.

This leads us to Norfolk Southern's second point, which gets the law half right. We agree that "if the [district] court's ruling" on a motion in limine "is in any way qualified or conditional," the moving party must object again when the evidence is offered at trial. *United States v. Poulsen*, 655 F.3d 492, 510 (6th Cir. 2011) (quoting *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)). However, "if the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered." *Brawner*, 173 F.3d at 970; *see also* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

Here, although the district court did enter a ruling on Allied Erecting's motion, it did not specifically address the manifest-absurdity argument. We need not determine whether the district court's ruling was "explicit and definitive" or "qualified or conditional," however, because even under the abuse-of-discretion standard that applies to a preserved evidentiary objection, *see Poulsen*, 655 F.3d at 510, Allied Erecting's manifest-absurdity argument fails. The district court did not "rel[y] on clearly erroneous findings of fact, use[] an erroneous legal standard, or improperly appl[y] the law" either in admitting King's testimony or in entering judgment for Norfolk Southern. *United States v. Arny*, 831 F.3d 725, 730 (6th Cir. 2016) (citation omitted).

At trial, Allied Erecting took the position that the agreement gave it an option to build Norfolk Southern a new roadway within ten years; Norfolk Southern argued that Allied Erecting had undertaken an obligation to do so. As for the quitclaim deed's reservation of an easement to Norfolk Southern, Allied Erecting would have argued at trial (had it been permitted to) that the "under and subject to" clause gave it a right to cross the Canfield Branch at the Powers Crossing.

24

The jury heard evidence from both sides and determined that Allied Erecting had indeed undertaken an obligation to build Norfolk Southern a new roadway and that Allied Erecting was obligated to, and had failed to, provide Norfolk Southern with an exclusive easement between Poland Avenue and the Haselton Yard. Then, the district court entered judgment accordingly.

Under Ohio law, "common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) (citations omitted). Despite citing this standard, Allied Erecting does not explain which words in the agreement and the quitclaim deed should be given any meaning other than their plain and ordinary meaning. Instead, it seems to argue that the district court's interpretation of the agreement and the quitclaim deed reflects a set of obligations so unfavorable to Allied Erecting that Allied Erecting would never have agreed to them. However, as the Ohio Supreme Court has made clear, "[c]ases of contractual interpretation should not be decided on the basis of what is 'just' or equitable. This concept is applicable even where a party has made a bad bargain, contracted away all his rights, and has been left in the position of doing the work while another may benefit from the work." *Ervin v. Garner*, 267 N.E.2d 769, 774 (Ohio 1971). Here, we cannot say that the jury's and the district court's determination that the parties intended the agreement's terms to be obligatory was manifestly absurd, given that the agreement did not contain the word "option" or provide for a period of time after which the agreement's terms would lapse.

As to Norfolk Southern's reserved easement, the district court was correct to exclude evidence of the Powers Deed, for reasons explained earlier. Once that evidence had been excluded, it was not manifestly absurd for the district court to conclude that Norfolk Southern's reserved

easement was supposed to be exclusive, even as against Allied Erecting. Other than its argument based on the Powers Deed, Allied Erecting offers no alternative reading of the quitclaim deed that would prevent its terms from being manifestly absurd in Allied Erecting's view.

Because Allied Erecting does not persuade us that the district court's interpretation of the agreement and the quitclaim deed is manifestly absurd, as opposed to simply burdensome to Allied Erecting, we hold that the district court did not err in admitting Norfolk Southern's evidence or in entering judgment for Norfolk Southern.

E.      Application of the Standard of Review

As discussed above, a party is entitled to JNOV if, viewing the evidence in the light most favorable to the nonmoving party, no reasonable mind could rule for that party. *See Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013). Allied Erecting has not satisfied that standard here. First, Allied Erecting has shown no error with regard to the alleged exclusion of its development plans and, at most, harmless error with regard to the admission of King's testimony. Although the district court was not correct in its grounds for excluding testimony about the Powers Deed—Allied Erecting's second argument—the exclusion of that evidence was nonetheless proper, so Allied Erecting cannot show error. Finally, Allied Erecting's manifest-absurdity argument is meritless.

Viewing the evidence in the light most favorable to Norfolk Southern, we conclude that the jury's verdict and the district court's judgment were reasonable, so Allied Erecting is not entitled to JNOV. Allied Erecting is not entitled to a new trial either: harmless error does not satisfy the abuse-of-discretion standard, so the district court did not abuse its discretion in denying the new trial motion. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994).

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Allied Erecting's motions for a new trial or, in the alternative, for judgment notwithstanding the verdict.